UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
ROSEMARIE TRUMAN                                    )
43988 Indian Fields Court                           )
Leesburg, VA 20176,                                 )
                                                    )
            Plaintiff,                              )        Civil Action No. _____
                                                    )        Jury Demand
      v.                                            )
                                                    )
PRTM MANAGEMENT CONSULTANTS, INC.                   )
1750 Pennsylvania Avenue NW                         )
Washington, D.C. 20006,                             )
                                                    )
      and                                           )
                                                    )
PRTM MANAGEMENT CONSULTANTS, LLC                    )
  Serve:                                            )
        Jeff Kaplan                                 )
        4854 Reservoir Road, N.W.                   )
        Washington, D.C. 20007,                     )
                                                    )
            Defendants.                             )
_____)

**COMPLAINT FOR DECLARATORY, INJUNCTIVE,
<u>AND MONETARY RELIEF AND JURY DEMAND</u>**

<u>PRELIMINARY STATEMENT</u>

1.      Plaintiff, Rosemarie Truman ("Plaintiff" or "Ms. Truman") brings this action

under the common law and the District of Columbia Human Rights Act, D.C. Code Ann. § 2-

1401 <u>et</u> <u>seq.</u>, against PRTM Management Consultants, Inc. and PRTM Management Consultants,

L.L.C. ("Defendants" or "PRTM") seeking injunctive relief to enforce the Confidential

Separation Agreement and Release entered into on August 21, 2008 (hereinafter, the

"Agreement"), or, in the alternative, monetary damages for injuries she has sustained as a result

of breach of the Agreement, discrimination on the basis of gender, retaliation for opposition to

gender discrimination, and intentional interference with a prospective contractual relationship.

<u>JURISDICTION AND VENUE</u>

2.      This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and suit is brought between citizens of different states.  Venue is proper in this jurisdiction under 28 U.S.C. § 1391(b).

<u>PARTIES</u>

3.      Plaintiff Rosemarie Truman is a citizen of Virginia who resides at 43988 Indian Fields Court, Leesburg, Virginia 20176.  Defendants PRTM employed Plaintiff as a Partner in its Washington, DC office from January 27, 2007 to August 25, 2008.

4.      Defendant PRTM Management Consultants, Inc. is a Delaware corporation engaged in international management consulting.  PRTM maintains one of its largest offices in terms of personnel and revenue in Washington, D.C.  PRTM Management Consultants, Inc. is not licensed to do business in Washington, D.C.  The August 21, 2008, Confidential Separation Agreement and Release is between Ms. Truman and PRTM Management Consultants, Inc.  <u>See</u> Exhibit A.

5.      Defendant PRTM Management Consultants, LLC is licensed to do business within the District of Columbia and maintains a registered agent here.  On information and belief, PRTM Management Consultants, LLC is the alter ego of PRTM Management Consultants, Inc.

2

FACTUAL ALLEGATIONS

**A.      Ms. Truman's Employment at PRTM.**

6.      Ms. Truman is a strategy consultant with approximately 15 years of experience in the business solutions arena and approximately 9 years of experience specifically in strategy consulting.  After graduating from Smith College in 1994, Ms. Truman went on to study at Oxford University and completed a "mini-MBA" program in 2001 while working as a consultant at Booz Allen & Hamilton.

7.      Mr. Michael Romeri, who had the longest tenure of any partner at PRTM, recommended that PRTM hire Ms. Truman as partner in PRTM's Washington, D.C. office.  At PRTM, the terms "director" and "partner" are interchangeable.  Ms. Truman was hired and began work in January 2007.  Mr. Romeri charged Ms. Truman with developing a Financial Services practice area and developing stronger methodologies and intellectual property in the area of Innovation that drives sustainable growth and differentiation for companies.

8.      At the time of her hire as partner, Ms. Truman was under a restrictive one-year non-compete agreement with IBM, her previous employer.  PRTM was fully aware of the IBM non-compete at the time of Ms. Truman's hire.  Despite the limitations of this non-compete agreement, Plaintiff brought in more than one million dollars in fees to PRTM in 2007.

9.      When she joined PRTM, Ms. Truman became the only female "client-facing" partner of nearly 100 client-facing partners in Defendants' East Coast offices.  PRTM's East Coast offices were a separate business entity from PRTM's West Coast offices until late 2007 when the East and West Coast companies re-united through a merger.  On information and belief, PRTM-East Coast has terminated each of its female client-facing partners within two

years of their hire.

10.     Within three months after Ms. Truman was hired, three male employees, including one partner, wished Plaintiff luck in surviving more than two years.  Ms. Truman also learned that several female principals had left PRTM because they perceived no opportunity for advancement.  Principals are directly below partners in the PRTM hierarchy.  Female consultants from several PRTM offices approached Ms. Truman and said "finally, a female partner"; they expressed their concerns about their own advancement in the firm.  After her first few months at PRTM, Plaintiff became very concerned about the lack of support and advancement of female employees and its potential effect on her own career.  Around October 2007, Ms. Truman approached Susan Kantor, a non-client-facing partner, to discuss the failure of PRTM to promote women and support women's careers.  Ms. Truman suggested a remediation approach to address the issue.  PRTM did not adopt Ms. Truman's approach, or any other remedial measures. Ms. Kantor stated that she could not support formation of a PRTM women's network.  PRTM did allow formation of a women's network, but not until Summer of 2008, after planning to push Ms. Truman out of the Company.

11.     On information and belief, PRTM has only promoted one woman on the East Coast, Mary Lyons, from principal to partner.  On information and belief, PRTM hired Ms. Kantor as a direct-entry partner, though Ms. Kantor was never client-facing.

12.     Ms. Truman regularly worked 80 to 100-hour weeks and traveled 80 percent of the time or more, typically leaving home on Monday and returning no earlier than Thursday evening.

13.     During 2007, several male PRTM partners were openly hostile to Ms. Truman.

4

For example, at the London office of one of PRTM's clients, Tom Godward, a PRTM partner, told Ms. Truman that "she had a bigger dick" than another male PRTM partner who was also present. On another occasion, Mr. Godward mentioned to a female principal that a client's breasts were fake. At another time, Mr. Godward expressed frustration to Ms. Truman, telling her that another partner could "suck his dick." One principal advised Ms. Truman that the only way to ingratiate herself with Mr. Godward, and get included in his deals, was to talk that way herself. Because these and other comments with sexual connotations made Ms. Truman uncomfortable, she wrote to Scott Hefter, PRTM CEO, regarding Mr. Godward's unwelcome comments. Mr. Hefter responded that he would talk to Mr. Godward. However, Mr. Godward continued to make the offensive and unwelcome comments. After Mr. Hefter approached Mr. Godward, Mr. Godward retaliated against Ms. Truman by cutting her out of deals.

14.    Shortly after the incidents at the client's London office, Mr. Romeri told Ms. Truman of an opportunity to run an IT strategy project with a senior IT executive at a major PRTM client, and suggested she contact Mr. Godward and Mr. Rahul Gupta, another partner, who were in charge of staffing the project. Mr. Gupta and Mr. Godward refused to give Ms. Truman the assignment, despite her extensive relevant experience, her availability, and her numerous written and verbal expressions of interest in the project. Mr. Gupta instead chose an external contractor.

15.    Throughout her time at PRTM, Ms. Truman worked closely with Kayvan Shahabi, a male partner who heads an industry group focused on software, electronics and services. In March 2007, Ms. Truman invited Mr. Shahabi to join her in a pitch to the CEO of a large bank, who was a family friend of Ms. Truman. At the meeting, Mr. Shahabi sabotaged Ms.

5

Truman's pitch by falsely telling the potential client that PRTM "does not know Financial Services" – Ms. Truman's specific area of expertise within the company. The comment undermined Ms. Truman's credibility, and the potential client, despite the friendship, did not agree to Ms. Truman's proposed deal.

16.    Mr. Shahabi frequently wrote Ms. Truman abusive emails, which he copied to other lead partners. A few other partners frequently told Ms. Truman that they could not understand why Mr. Shahabi treated her so poorly.

17.    In June 2007, PRTM's New York office received a call regarding a possible project with a Brazilian bank. Although the call should have been routed to Ms. Truman as head of Financial Services, it was instead routed to Mr. Romeri, who did not make Plaintiff aware of the opportunity. Instead, Ms. Truman found out about the opportunity from a PRTM principal who asked her to join the sales pitch. Ms. Truman wrote an email to the representative of the potential client to let her know she would be joining the pitch. Shortly after Ms. Truman sent this email to the client, Mr. Romeri called Ms. Truman and told her not to join the pitch and said that he was "teach[ing] her a lesson."

18.    Prior to working for PRTM, Ms. Truman had provided services to a company that was also a PRTM client. Around October 2007, Guy Lardieri, a representative of that company with whom she had worked previously, approached Ms. Truman directly to request a proposal to create a new software business model strategy for the potential client. After receiving the call, Ms. Truman informed other partners, who told her to inform Patrick Gordon, who had facilitated a PRTM engagement with the client several years earlier. Shortly after Ms. Truman apprised Mr. Gordon of the opportunity for the software business model opportunity, Mr. Hefter gave Mr.

Gordon a significant multi-month "client investment budget" to perform a free due diligence review for the client.  The two agreed that Ms. Truman would remain in the background while Mr. Gordon performed the free due diligence, with the understanding that if the software business development became a component of the project, Ms. Truman would become involved. Mr. Gordon's due diligence review concluded that the only significant area in which the client needed improvement was in its software business model.  When the client decided to pursue the opportunity with PRTM, Mr. Gordon cut Ms. Truman out of the $2.0 million dollar deal and brought in male partners, including Eric Finch of the West Coast office, who had limited familiarity with the client.  In PRTM's "opportunity management system," a database for tracking the company's opportunities, Ms. Truman had identified and qualified this client deal in the tracking system months before Mr. Gordon received his investment budget to fund the due diligence review.  Someone at PRTM closed Ms. Truman's entry in the system, classifying it as "unsuccessful," and classified Mr. Gordon's project as a "win."  Ms. Truman brought this issue to Mr. Hefter's attention, but he took no corrective action.

19.    In late 2007 or early 2008, during a PRTM European partners' meeting, David Percival, a male partner, created a Power-Point slide  document disparaging Ms. Truman's abilities and showed it to Mr. Hefter and Dean Gilmore, CEO of PRTM's Europe Division.  Mr. Percival created this slide after Ms. Truman and Mr. Percival met with a client who asked Mr. Percival "what value are you adding? I'm not sure why we pay for your rates."  The client then complimented Ms. Truman.  Mr. Hefter admitted to Ms. Truman that Mr. Percival's view had been "unbalanced," but he did not address the situation with Mr. Percival.

20.    Networking with potential clients in the Financial Services industry was an

essential component of Ms. Truman's work.  Although PRTM provided other partners with access to conferences and marketing budgets, Ms. Truman had no such access or budget with which to build her business.  In contrast, PRTM provided Mr. Anil Khurana, a male partner who joined PRTM at only a few months prior to Ms. Truman, was provided the opportunity to conduct several conferences, including an operational conference jointly sponsored by The Economist magazine.  These conferences gave Mr. Khurana a substantial platform from which to build his business.  Ms. Truman was denied a $3,500 membership fee to the American Banking Association, a standard membership group in the financial services field.  Mr. Romeri, Mr. Khurana, and other male partners were regularly permitted to spend thousands of dollars for professional development.

21.    Ms. Truman tried repeatedly to meet with Mr. Godward and Mr. Romeri to address the opportunities PRTM was denying her.  Mr. Godward refused to attend any such meetings.  Mr. Romeri met with Ms. Truman in mid-to-late 2007 and acknowledged that Mr. Godward had been unfair to her because she had complained to Mr. Hefter.  Mr. Romeri indicated that Mr. Godward's hostility towards Ms. Truman would be detrimental to her career with PRTM.

22.    Ms. Truman brought it to Ms. Lyon's attention that Todd Bargman, another male partner, was excluding her from meetings.  After Ms. Lyons spoke with Mr. Bargman about Ms. Truman's complaint, Mr. Bargman never spoke with Ms. Truman again, which effectively excluded her from all opportunities to which she ordinarily would have had access through Mr. Bargman.  Mr. Bargman regularly included male partners in such opportunities.

23.    Despite a lack of support from Defendant, Plaintiff brought the company an

8

extremely valuable client in 2008, referred to herein as "Client A", through one of her long-standing professional contacts.  By June 2008, she had sold $4 million in services, exceeding her goal of $3 million, and she was very likely to make additional sales to Client A and other clients.

24.    Mr. Shahabi was in charge of staffing the project Ms. Truman led for Client A. Initially, Mr. Shahabi agreed to the suggested allocation of resources Ms. Truman had submitted to him, but soon after, he began jeopardizing the Client A project by not providing the necessary staff.  Mr. Shahabi justified his actions by accusing Plaintiff of not following the staffing process.

25.    Partners Cuneyt Oge, Rich Sheinfeld, Bill Somers and Marc Waco expressed disbelief to Ms. Truman about Mr. Shahabi's refusals to staff Plaintiff's Client A project.  Only after Peter Weitfelt, Bob Pethick, Mohammed Kande, Cuenyt Oge and other partners told Mr. Shahabi to pay attention to Client A did he provide sufficient resources for the Client A project. Mr. Oge pointedly asked Mr. Shahabi if he was trying to make Ms. Truman fail and told Ms. Truman that he believed that is what Mr. Shahabi was doing.

26.    Ms. Truman called Mr. Shahabi several times to try to resolve the client staffing issues and left messages. Mr. Shahabi told Ms. Truman that she did not make the list of people he would call back.

27.    In May 2008, Mr. Shahabi surprised Ms. Truman by calling her during an on-site client meeting from a nearby café.  Mr. Shahabi insisted that Ms. Truman bring him in to Client A's offices to "inspect."  On information and belief, PRTM partners seldom went onto client sites without prior appointment.

28.    In 2008, Plaintiff was both the only female partner serving clients in Defendants'

9

East Coast Offices, and the only partner not assigned to an industry group.  Industry groups are the source of marketing budgets for conferences and other educational opportunities, as well as staffing and hiring.  Affiliation with an industry group provides opportunities to meet staff that will be available for assignments, and to share knowledge and get involved in deals originated by other partners.  Industry groups also take occasional trips that provide partners with opportunities to network and make deals.  Because Ms. Truman was not assigned to a group, she missed out on these opportunities that were available to her male peers.  In addition, Ms. Truman did not supervise the staff assigned to her projects, who all had industry group affiliation.  Male partners typically had three to five direct reports.  Ms. Truman's lack of management responsibility caused staff assigned to her projects to question her authority and influence within PRTM.

29.     Ms. Truman reported to Mr. Hefter that her experience of sex discrimination and hostile environment in PRTM's East Coast offices had been the worst of her career.  She made this report to Mr. Hefter on at least three occasions:  in the fall of 2007, in January 2008, and again on July 15, 2008.  She made similar comments to Mr. Michael Aghajanian, PRTM's Americas CEO, who agreed there were problems.  Mr. Aghajanian took no corrective action of which Ms. Truman was aware.

30.     In May 2008, Ms. Truman reported to Ms. Lyons that she was the only partner whom Defendants did not include in an industry group and that this exclusion meant she had no access to resources except through Mr. Shahabi, who had already been extremely abusive.

31.     Six weeks after Plaintiff complained that she was not included in a group, on June 18, 2008, the Human Resources Vice President, Ms. Lyons, Mr. Shahabi, and the CEO, Mr. Hefter, abruptly scheduled a meeting with Plaintiff on very short notice.  Ms. Truman sent Ms.

10

Lyons her calendar for the day of the requested meeting to show that she was fully booked, but Ms. Lyons insisted on scheduling a meeting, although she refused to provide Ms. Truman with a topic or agenda. Ms. Truman made special flight arrangements to go to Boston for an off-site meeting with Ms. Lyons and Mr. Shahabi. Mr. Hefter participated by cell phone.

32.     In that meeting, Ms. Lyons and Mr. Shahabi falsely accused Ms. Truman of falsifying her academic credentials, falsely claiming involvement in patents sought by a prior employer, and engaging in disruptive action and not following processes in obtaining staff for her projects. Ms. Truman had been following the process that partner Bill Somers, head of staffing, had instructed her to follow. Mr. Shahabi changed the process and Ms. Truman followed the new process.

33.     Ms. Lyons and Mr. Shahabi made these statements with the knowledge that they were false or in reckless disregard of their truthfulness.

34.     Ms. Truman had submitted an accurate biography to PRTM, stating that she had studied for a Ph.D. and had obtained a mini-M.B.A. Defendants' marketing department had changed these facts and prepared a biography stating Plaintiff had both an M.B.A. and a Ph.D.

35.     Ms. Truman submitted proof of her academic credentials to rebut the false allegations. The information Plaintiff submitted included the patent disclosure numbers for which she believed patents were pending or had been awarded; a copy of her 1994 undergraduate diploma from Smith College; a copy of her 1998 matriculation announcement from Oxford University; and a letter from Anju Simon, a former Booz Allen principal who supervised Ms. Truman while she completed her mini-MBA course offered by the firm.

36.    On June 30, 2008, Cliff Mount, Esq., Ms. Truman's husband, who was acting as her attorney at the time, notified Ms. Lyons, Mr. Shahabi and Mr. Hefter that Ms. Truman would be retaining employment counsel to advise her with respect to her experience of sex discrimination, harassment, and hostile work environment at PRTM.

**B.    Formation of the Confidential Separation Agreement and Release.**

37.    On or about July 22, 2008, Mr. Hefter told Ms. Truman that PRTM wanted her out of the Company and that PRTM "had enough on her to fire her," but that she could resign instead.  Mr. Hefter assured Ms. Truman that if she resigned, she would receive the full value of her 2007 bonus converted from stock to cash; that she would be made whole in terms of compensation; and, finally, that she could take Client A with her.  Mr. Hefter stated that Defendants did not want anything to do with Client A.

38.    After speaking with Mr. Hefter, Ms. Truman spoke with a key contact at Client A. She indicated that she would be leaving PRTM and they discussed an arrangement in which she would continue to perform work for Client A, full-time, subject to review at the end of 2009. They discussed a reasonable rate and expected number of hours.

39.    Counsel for Ms. Truman and PRTM then discussed the separation verbally, exchanged terms of a separation agreement via e-mail, and then exchanged drafts of the Agreement.  In every discussion, e-mail, and draft, both parties took the position that PRTM would waive non-compete and non-solicitation provisions to permit Plaintiff to continue to work for Client A.

40.    Although Mr. Hefter had assured Ms. Truman that PRTM did not want to take work from Client A for itself, that was not the case.  In fact, Mr. Shahabi was independently

calling Client A, unbeknownst to Plaintiff, to negotiate a Master Services Agreement ("MSA") that could continue past Ms. Truman's planned departure from the Company.

41.     In a further effort to drive a wedge between Plaintiff and Client A, PRTM insisted that as a condition of settlement, Ms. Truman agreed to the designation of a "Senior Director" to serve as a liaison to Client A.  For the Senior Director position, PRTM designated PRTM partner Marc Waco.  On information and belief, Mr. Waco had plans to solicit business from Client A.

42.     Even when Ms. Truman offered to provide financial assurance to PRTM that Client A would pay its bill, PRTM insisted on placing Mr. Waco in contact with Client A as Senior Director.  PRTM does not have "Senior Directors" on other projects.  Further, PRTM refused to agree that Mr. Waco would not solicit work from Client A, despite Mr. Hefter's statement to Ms. Truman that PRTM did not want Client A.

43.     On Friday, August 15, 2008, Ms. Truman learned that PRTM had fired a female member of the team assigned to the Client A project without giving Ms. Truman prior notice or allowing her to provide for the smooth transition of the employee's knowledge to other team members.  The effect of Defendants' termination of the female team member was to impede Ms. Truman's work for the client.

44.     In the meantime, Mr. Shahabi reached out to Client A to try to have a one-on-one discussion without Ms. Truman's knowledge.

45.     On or about August 16, 2008, Ms. Truman telephoned and wrote Mr. Hefter and told him that PRTM was continually creating a hostile work environment and engaging in sex discrimination against her, and that she wanted the discrimination to stop.

46.     In the course of settlement negotiations, Defendants' counsel insisted that

Plaintiff provide to them the names of every client contact from whom she had solicited business during her employment at PRTM.  Plaintiff complied on August 18, 2008.

47.     On Monday, August 18, 2008, PRTM set a deadline that Plaintiff would have to accept the Agreement by 5:00 p.m. on Tuesday, August 19, 2008, or PRTM would fire her.  Late in the afternoon, on Tuesday, August 19, 2008, PRTM responded to several terms presented by Ms. Truman, and requested an additional term, which it did not present in written form.  The parties agreed to defer signing briefly to allow Ms. Truman time to consider these new terms.

48.     At 4:55 p.m. on Wednesday, August 20, 2008, Defendants provided a new version of the Agreement and insisted that Plaintiff's counsel approve the agreement by 5:30 p.m., less than one hour later, and that Plaintiff sign the Agreement that evening.  See Exhibit B. Because Plaintiff had evening meetings scheduled at Client A, and because of a brief miscommunication over the need for her to sign both the Agreement and the accompanying Release, Plaintiff's counsel requested an extension of time of less than one day to complete execution of the agreement.  Defendants acceded to these requests but insisted that Ms. Truman sign the final agreement by 9:00 a.m. the following morning.  See Exhibit C.

49.     Plaintiff signed the Agreement and accompanying release.  Counsel sent it to Defendants at 8:40 a.m. on August 21, 2008.  A copy of the executed Agreement is attached as Exhibit A.  Counsel for the Defendants twice indicated that PRTM and Mr. Waco had signed the agreement.  See Exhibits D and E.  Defendants never sent this signed agreement to Plaintiff.

50.     The Separation Agreement provided that Ms. Truman's employment with PRTM would continue until October 31, 2008 (known as the "Separation Date" and the "Wind-Down Date" in the Agreement) and that Ms. Truman and PRTM would describe her separation from

14

employment as a resignation. The Agreement provided that through the Separation Date, Ms. Truman would continue to work on the project currently in progress for Client A.  The agreement left intact the provisions from Ms. Truman's employment agreement that allowed PRTM to terminate her for cause, but not for any reasons that PRTM knew of as of August 19, 2008.

51.    The Separation Agreement provided that Mr. Waco would be PRTM's only representative, other than Ms. Truman, for purposes of communicating with Client A through the Wind-Down Date.

52.    The Separation Agreement provided that Ms. Truman would have prior notice of Mr. Waco's contacts with Client A and an opportunity to participate in all such contacts.  The Separation Agreement provided that neither Mr. Waco's communications with Client A, nor his communications with Ms. Truman, nor his communications with PRTM employees assigned to the Client A project, would "unreasonably disrupt work" on the Client A Project.

53.    The Agreement provided that PRTM would pay to Ms. Truman: (a) her salary through February 8, 2009; (b) the equivalent of her salary through August 8, 2009; (c) the cash value of her 2007 bonus, which had been converted to PRTM stock; (d) her 2008 bonus, in cash; (e) a partial bonus for 2009; and (f) Truman's attorney's fees up to a cap.  Payments (b), (d), and (e) were conditioned upon Client A paying PRTM's bills.

54.    The Separation Agreement granted to Ms. Truman the right to continue to use certain intellectual property that she had brought with her to PRTM, the right to solicit work from a listed group of client contacts she had known prior to joining PRTM, and the right to continue working for Client A.

55.     The Separation Agreement authorized Ms. Truman to disclose its contents "to the extent required by law or to the extent necessary to enforce her rights under this Agreement."

**C.     PRTM Breaches the Separation Agreement and Abruptly and Wrongfully Terminates Ms. Truman.**

56.     On Thursday, August 21, 2008, Plaintiff's father-in-law died.  Plaintiff worked from home on Friday, August 22, 2008, Saturday, August 23, 2008, and Sunday, August 24, 2008.  On Monday, August 25, 2008, she attended the funeral with her husband.  Later on Monday, August 25, 2008, as Ms. Truman was returning to New York, where Client A is located, PRTM fired her and reneged on the Agreement.

57.     After learning that Ms. Truman would be leaving PRTM, Client A had directed her to transition PRTM staff off the project as quickly as possible, to be replaced by other consultants and contractors.  Plaintiff spoke with members of her team to inform them that she was resigning and that their time on the project would end very soon and that they would need to transition work to another consulting firm.  Plaintiff told several of these individuals that she had enjoyed working with them, that they were talented, and that she would like to work with them again in the future.  Plaintiff also told each of these individuals that she had a non-solicitation clause.  Ms. Truman was concerned that without proper encouragement of these employees, they would cease to perform at peak and this would hurt the deliverables to Client A.

58.     PRTM made travel plans for Mr. Shahabi to travel from Washington, D.C., where he lives and works, to Long Island, New York on August 26, 2008.

59.     On information and belief, Defendants also directed staff assigned to the Client A project to attend an urgent meeting somewhere in New York on the night of August 25, 2008, reassigning them away from tasks at Client A.  This action unreasonably disrupted progress on

16

the project.

60.     On Monday, August 25, 2008, Plaintiff attended the funeral of her father-in-law in the Washington, D.C. area.  After the funeral, she went to the airport to catch a 5:00 p.m. flight to LaGuardia to return to the Client A site.  While waiting for her flight to take off, Ms. Truman received an e-mail from Ms. Lyons, asking her to call sometime in the next 2 hours for a 15 minute call.  Plaintiff called Ms. Lyons after the plane landed in New York at approximately 7:00 p.m.  Ms. Lyons immediately said to Plaintiff, "You're terminated".... "Can you hear me?".... and then the connection broke.

61.     Plaintiff called Lyons back at 8:00 pm.  Ms. Lyons explained to Ms. Truman that she was being terminated for soliciting PRTM employees.

62.     Ms. Lyons then sent Plaintiff a document falsely asserting that the Separation Agreement was not valid because it had not been "exchanged" by the parties and asserting that even if were valid, PRTM was terminating it because she had solicited PRTM employees, which was not true.  Ms. Lyons asserted that Plaintiff had violated her Confidentiality Agreement and was being terminated pursuant to her Employment Agreement, both of which had been entered into in November 2007.

63.     Ms. Lyons instructed Plaintiff not to contact any PRTM client, including Client A.  Removing Plaintiff from the site delayed work on the project and jeopardized the future of the project.

## COUNT I
## BREACH OF CONFIDENTIAL SEPARATION AND RELEASE AGREEMENT

64.     Plaintiff adopts and incorporates by reference the allegations set forth in paragraphs 1 through 63 as though restated.

17

65.    The parties entered into a valid and enforceable Agreement.  Plaintiff executed and delivered the Agreement within the time frames demanded by Defendants' Counsel. Defendants also executed the Agreement.  See Exhibits A through E.

66.    In refusing to honor its obligations under the Agreement, Defendants have materially breached their agreement by terminating Ms. Truman's employment, disrupting the work for Client A, and refusing to pay Ms. Truman the monies owed her under the Agreement.

67.    Plaintiff will incur a substantial financial loss and will lose the opportunity to earn income from Client A and other potential clients covered by the waiver of the non-compete requirements in the Agreement.  Her loses include, but are not limited to, $2.2 million to $2.5 million in potential income working for Client A and other clients; this includes the $800,000, which is the value of her continued salary, 2007 bonus, 2008 bonus, partial 2009 bonus, and her attorneys' fees.

**COUNT II**
**DISCRIMINATION IN VIOLATION OF**
**THE D.C. HUMAN RIGHTS ACT, D.C. CODE § 2-1402.11(a)**

68.    Plaintiff incorporates, as though restated here, each of the factual allegations stated in paragraphs 1 through 67 above.

69.    The District of Columbia Human Rights Act prohibits discrimination in employment on the basis of gender with regard to the terms, privileges and conditions of employment.

70.    Although Plaintiff had the title of Partner, she lacked the indicia of control of an owner, and was an employee of PRTM for purposes of the D.C. Human Rights Act.

71.    Despite the fact that Plaintiff brought PRTM substantial revenue at a time when

18

PRTM was starved for revenue, PRTM terminated Plaintiff.

72.     Defendants' actions that are described in this Complaint, including but not limited to PRTM's failure to provide her corporate opportunities, advancement opportunities, and other compensation generating opportunities, commensurate with male partners, constitute discrimination on the basis of gender in violation of the District of Columbia Human Rights Act, D.C. Code § 2-1402.11(a).

73.     Defendants deprived Ms. Truman of her right to enjoy equal opportunity to participate in her employment with PRTM.  D.C. Code § 2-1402.01.

74.     Defendants' discriminatory actions were intentional, malicious, reckless and taken in bad faith.

75.     Defendants' termination of Ms. Truman's employment was discriminatory, in violation of the D.C. Human Rights Act.

76.     Defendants created and maintained a sexually hostile work environment in violation of the D.C. Human Rights Act.

77.     Defendants' violation of the D.C. Human Rights Act directly and proximately caused Plaintiff loss of income and other economic benefits, job search costs, the loss of future employment opportunities, impairment of her future earning capacity, and damage to her professional reputation.  Defendants' violation of the D.C. Human Rights Act also caused Plaintiff significant emotional distress.

78.     After Ms. Truman had been employed at PRTM for approximately eleven months, PRTM asked her to sign a U.S. Director Employment Agreement and release of any legal claim, including sex discrimination, through the date of the release, November 16, 2007.

Ms. Truman seeks compensation for hostile work environment, denial of business opportunities, and wrongful termination, on the basis of gender that occurred after that date.

## COUNT III
### RETALIATION AGAINST PLAINTIFF FOR EXERCISING AND ENJOYING RIGHTS PROTECTED UNDER THE D.C. HUMAN RIGHTS ACT IN VIOLATION OF D.C. CODE § 2-1402.61

79.    Plaintiff incorporates, as though restated, each of the factual allegations stated in paragraphs 1 through 78 above.

80.    Under the D.C. Human Rights Act, it is "an unlawful discriminatory practice to coerce, threaten, retaliate against, or interfere with any person in the exercise or enjoyment of, or on account of having exercised or enjoyed, or on account of having aided or encouraged any other person in the exercise or enjoyment of any right granted or protected under" the District of Columbia Human Rights Act.  D.C. Code § 2-1402.61.

81.    Although Plaintiff had the title of Partner, she lacked the indicia of control of an owner, and was an employee of PRTM for purposes of the D.C. Human Rights Act.

82.    Defendants retaliated against Plaintiff because she opposed sex discrimination, including but not limited to cutting her out of deals, denying her professional opportunities and terminating her employment.

83.    Defendants' actions constitute retaliation in violation of the District of Columbia Human Rights Act, D.C. Code § 2-1402.61.

84.    Defendants' retaliatory actions were intentional, willful, reckless, malicious, and taken in bad faith.

85.    Defendants' retaliatory actions damaged Plaintiff's professional reputation and caused her embarrassment, humiliation and indignity.

20

86.     Defendants' retaliation directly and proximately caused Plaintiff loss of income and other economic benefits, job search costs, the loss of future employment opportunities, impairment of her future earning capacity, damage to her professional reputation, and emotional distress.

87.     Plaintiff seeks remedies for all acts of retaliation after November 16, 2007.

**COUNT IV**
**TORTIOUS INTERFERENCE WITH PROSPECTIVE**
**CONTRACTUAL RELATIONS**

88.     Plaintiff incorporates as though restated each of the allegations set forth in paragraphs 1 though 87 above.

89.     At the time that she executed the Agreement, Plaintiff had a prospective contractual relationship with Client A, which she relied upon in deciding to resign her position at PRTM and enter into the Agreement.

90.     PRTM knew about Plaintiff's prospective contractual relationship with Client A, for it was Mr. Hefter who said Plaintiff should leave and take Client A with her.  The parties entered into the Agreement that would have allowed Plaintiff to continue working for Client A and to solicit work from Client A in the future.

91.     Defendants intentionally injured Plaintiff's prospective contractual relationship with Client A, by fabricating allegations of breach of a non-solicitation clause, disrupting the Client A project, firing Ms. Truman abruptly while she was away from the Client A Project for her father-in-law's funeral, and sending Mr.  Shahabi to negotiate directly with Client A.

92.     Defendants intentionally took these actions knowing they could lead to Plaintiff not being hired by Client A.

93.    Defendants took these actions intending to keep the Client A work for itself.

94.    Plaintiff has suffered, and will suffer, economic and reputation damages arising from Defendants' intentional interference with her prospective contractual relationship with Client A, including lost future compensation and the scar of being abruptly unemployed in a highly specialized career field.  Her damages can be estimated at between $2.2 million to $2.6 million.

95.    Defendants' actions were taken in bad faith, are intentional, and have directly and proximately caused, and continue to cause, Plaintiff a loss of income and other financial benefits, emotional distress, embarrassment, humiliation, indignity, and damage to her professional reputation, the exact amount to be proven at trial, plus interest thereon.

**NOW WHEREFORE** Plaintiff prays this court for the following relief:

1.    A declaratory judgment that Defendants' termination of Plaintiff's employment was in violation of the D.C. Human Rights Act;

2.    A declaratory judgment that the Confidential Separation Agreement and Release between Plaintiff and Defendants is valid and enforceable;

3.    All monetary relief provided by the Agreement;

4.    An award of front pay to Plaintiff from Defendants;

5.    An award of back pay to Plaintiff from Defendants;

6.    An award of compensatory damages to Plaintiff from Defendants in an amount to be determined by a jury;

7.    An award of punitive damages to Plaintiff from Defendants in an amount to be determined by a jury;

8.     An award to Plaintiff of reasonable attorneys' fees and costs, including expert

witness fees; and

9.     All other relief this Court deems just.

Respectfully submitted,

David Wachtel  DC Bar # 427890
Bernabei & Wachtel, PLLC
1775 T Street, N.W.
Washington, D.C. 20009
Tel. (202) 745-1942
Fax (202) 745-2627
Email: Wachtel@Bernabeipllc.com

Lynne Bernabei  DC Bar # 938936
Bernabei & Wachtel, PLLC
1775 T Street, N.W.
Washington, D.C. 20009
Tel. (202) 745-1942
Fax (202) 745-2627
Email: Bernabei@Bernabeipllc.com

Alan Kabat  DC Bar # 464258
Bernabei & Wachtel, PLLC
1775 T Street, N.W.
Washington, D.C. 20009
Tel. (202) 745-1942
Fax (202) 745-2627
Email: Kabat@Bernabeipllc.com

*Attorneys for Rosemarie Truman*

DATED:  August 29, 2008

23

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ROSEMARIE TRUMAN | ) |
| Plaintiff, | ) |
| v. | ) |
| PRTM MANAGEMENT CONSULTANTS, INC., *et al.*, | ) Civil Action No. _____ |
| Defendants. | ) |

### DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims so triable.

Respectfully submitted,

David Wachtel  DC Bar # 427890
Lynne Bernabei  DC Bar # 938936
Alan Kabat  DC Bar # 464258
Bernabei & Wachtel, PLLC
1775 T Street, N.W.
Washington, D.C. 20009
(202) 745-1942
fax (202) 745-2627

*Attorneys for Rosemarie Truman*

DATED:  August 29, 2008

24

**Exhibit A**

<u>Truman v. PRTM Management Consultants, Inc., *et al.*</u>

## David Wachtel

| | |
|---|---|
| **From:** | David Wachtel |
| **Sent:** | Thursday, August 21, 2008 8:40 AM |
| **To:** | 'Reif, Alison' |
| **Subject:** | Signed Truman August Release |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Orange |

David Wachtel
Bernabei & Wachtel
1775 T Street, N.W.
Washington, D.C. 20009
(202) 745-1942 (ext. 235)

The information contained in this e-mail message is intended for the personal and confidential use of the designated recipient(s) named in the address box. This message may be attorney-client communication, and as such, is privileged and confidential. Do NOT forward this message to any third party. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error, and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this message in error, please notify us immediately by telephone; delete this message from all your files, and return any printouts you may have made to us by regular mail.

Truman v. PRTM Complaint
Exhibit A

## CONFIDENTIAL SEPARATION AND RELEASE AGREEMENT

This Confidential Separation and Release Agreement (the "Agreement") is entered into by and between PRTM Management Consultants, Inc. ("PRTM") and Rosemarie Truman ("Truman") (individually, a "Party", and together, the "Parties"), effective August 19, 2008.

WHEREAS, Truman has been employed by PRTM as a director pursuant to a U.S. Director Employment dated November 16, 2007 (the "Employment Agreement"); and

WHEREAS, Truman also owns PRTM stock (the "Shares") pursuant to the PRTM Management Consultants, Inc. Stockholders Purchase and Sale Agreement dated November 16, 2007 (the "Stockholders Agreement"); and

WHEREAS, the Parties desire to enter into a written agreement embodying their mutual understandings and promises concerning resolution of any and all issues concerning Truman's employment by PRTM, her separation from such employment, and the purchase of her Shares by PRTM;

NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

### A.    TRUMAN'S SEPARATION FROM EMPLOYMENT

1.    Truman's employment by PRTM will end effective October 31, 2008 (the "Separation Date"). The Parties will describe Truman's separation from employment as a resignation.

2.    Truman will continue to receive her current salary and benefits through the Separation Date. She will also be paid for any accrued, unused vacation owed to her as of the Separation Date and be reimbursed for all reasonable expenses incurred by her through the Separation Date, in both instances in accordance with and subject to the terms of applicable PRTM policies.

3.    Through the Separation Date, Truman will continue to work on the project for █████████ currently in progress (the "████████ roject") as set forth in Section B of this Agreement below. Truman will not be assigned to any other PRTM project and will not contact, communicate with, or perform work on behalf of any other PRTM client through the Separation Date, *provided that* Truman shall assist PRTM as requested with respect to the transition of her employment duties and responsibilities.

4.    Truman will conduct herself professionally in her capacity as a PRTM employee and director, and will continue to be subject to PRTM personnel and other policies, including without limitation PRTM's Insider Trading and Conflict of Interest

Policies, through the Separation Date.  She acknowledges that she will continue to owe a fiduciary duty to PRTM through the Separation Date and agrees not to take any actions inconsistent with PRTM's best interests through the Separation Date.

5.    PRTM reserves the right to terminate Truman for Cause as defined in the Employment Agreement, in which event the provisions of the Employment Agreement, Stockholders Agreement, and any other agreements between the Parties relating to a termination for Cause shall govern and this Agreement shall be of no further force and effect, *provided that* (a) any duties assigned or instructions given to Truman for purposes of Section 5.02(a) of the Employment Agreement will be consistent with the provisions of this Agreement, and (b) PRTM expressly waives the right to terminate Truman for Cause based on any act or failure to act by Truman of which PRTM has actual knowledge as of the effective date of this Agreement.  The Parties expressly agree that the reference in Section 5.02(b) of the Employment Agreement to "any other agreements between the Director and the Company" shall for purposes of this Section A.5 be interpreted to include this Agreement.

**B.    THE ▮▮▮▮▮ PROJECT**

1.    Truman will wind-down PRTM's involvement in the ▮▮▮▮Project on or before the Separation Date (the "Wind-Down Date").  She will continue to serve as the lead project director for PRTM on the ▮▮▮▮Project and, as such, will continue to be responsible for its successful management, through such Wind-Down Date.

2.    A second PRTM director, Marc Waco ("Waco"), will serve as senior director for PRTM on the ▮▮▮▮Project through the Wind-Down Date.  As such, Waco will serve as PRTM's exclusive representative for purposes of communicating with Truman on matters relating to ▮▮▮▮through the Wind-Down Date, and shall serve as PRTM's only representative, other than Truman, for purposes of communicating with ▮▮▮▮ through the Wind-Down Date.

3.    Waco may communicate with ▮▮▮▮ on matters relating to the ▮▮▮▮ Project for the purpose of confirming that the Project is proceeding to ▮▮▮▮ reasonable satisfaction and in furtherance of PRTM's legitimate business interests, *provided that* (a) Waco will not initiate any communication with ▮▮▮▮without reasonable prior notice to Truman, (b) Truman may be present for any meetings between Waco and ▮▮▮▮, and a party or participant to any telephone calls or other communications between Waco and ▮▮▮▮(c) Waco will provide reasonable cooperation in scheduling such meetings, calls, and communications so that Truman may participate, and (d) such communications may not unreasonably disrupt work on the ▮▮▮▮Project.

4.    Waco may communicate with Truman on matters relating to the ▮▮▮▮ Project by phone, email and/or in person at PRTM's offices or such other reasonable locations (other than on-site at ▮▮▮▮without reasonable prior notice to Truman) as needed and/or as may be requested by Waco through the Wind-Down Date, *provided that* such communications may not unreasonably disrupt work on the ▮▮▮▮Project.

5.    Waco may communicate with any other PRTM employees assigned to the ▮▮▮▮Project on any matter relating to the ▮▮▮▮▮Project at any time through the Wind-Down Date, *provided that* (a) Waco will not disclose to such other PRTM employees that Truman has tendered her resignation from the Company; and (b) such communications may not unreasonably disrupt work on the ▮▮▮▮Project, and (c) such communications will not include meetings on-site at ▮▮▮▮and (d) Truman acknowledges and agrees that all such PRTM employees remain subject to PRTM's ultimate direction and control.

6.    In the event that Waco is unable to serve as senior director as set forth above through the Wind-Down Date, the Parties shall promptly agree upon a mutually acceptable alternative director, it being understood that neither Party will make unreasonable objections to the other's proposed alternative and that time will be of the essence in terms of selecting a reasonable alternative director.

7.    Truman acknowledges and agrees that one of her material duties as lead project director for the ▮▮▮ Project through the Wind-Down Date is the timely billing and collection of all fees, expenses and disbursements owed to PRTM in connection with the ▮▮▮Project through the Wind-Down Date (the "▮▮▮▮Project Fees"). If the ▮▮▮Project Fees are not paid to PRTM in full within seventy-five (75) days of the date the work to which the ▮▮▮▮Project Fees invoice relates was performed, PRTM shall be relieved of any obligation to (a) continue to pay Truman an amount equal to her salary rate as set forth in Section C.1 below after February 8, 2009; and (b) make the amounts referenced in Section C.4 below.  Should ▮▮▮▮pay the ▮▮▮▮Project Fees in full at any time on or before February 8, 2009, PRTM will pay Truman the amounts set forth in Sections C.1 and C.4 below.  Should ▮▮▮▮pay 80% or more of the ▮▮▮▮. Project Fees before February 8, 2009, but not pay the ▮▮▮ Project Fees in full, payments to Truman under Sections C.1 and C.4 shall be reduced by fifty percent (50%).

## C.    POST-SEPARATION PAYMENTS

1.    PRTM will continue to pay Truman an amount equal to her current salary rate, less applicable taxes and withholdings and in accordance with PRTM's regular payroll practices, from the Separation Date through August 8, 2009.

2.    Truman may continue to participate in PRTM's medical and/or dental insurance plans on the current basis through February 8, 2009.  She may then elect continued medical and/or dental insurance coverage at 102% at the monthly premium cost pursuant and subject to the federal law known as COBRA.

3.    Truman's Change of Status Date as defined in the Stockholders Agreement will be her Separation Date.  On November 1, 2008, PRTM will purchase all of Truman's Shares for $220,821.16, representing the full undiscounted price for such Shares as of the Change of Status Date pursuant to the Stockholders Agreement.

4.    On February 9, 2009, PRTM will pay to Truman (a) an amount equal to the full annual bonus she would have received under the PRTM Management

Consultants, Inc. Compensation Plan (the "Compensation Plan") had she remained employed by PRTM as a director through December 31, 2008 (the "Full Bonus Payment"), less taxes and withholdings, it being expressly understood and agreed that Truman will receive the Full Bonus Payment in cash and that she will have no obligation to purchase Shares in connection with same; and (b) an additional amount equal to the Full Bonus Payment multiplied by 39/365 (*i.e.*, the number of days from January 1 through February 8, 2009, divided by the total number of the calendar days in 2009), less applicable taxes and withholdings.

5.      PRTM represents and warrants that as of the effective date of this Agreement, Truman's Full Bonus Payment is on track to be approximately $298,000, it being understood that the actual amount of the Full Bonus Payment is not yet subject to final determination. PRTM shall provide Truman with documentation of the final determination of the Final Bonus Payment at such time as it is available. The Parties acknowledge and agree that said amount represents only PRTM's current good faith estimate, and that the Full Bonus Payment actually owed to Truman may be less or more than this estimate.

6.      PRTM will reimburse Truman for her reasonable attorneys fees incurred in connection with the negotiation and execution of this Agreement, up to a cap of $10,000, upon receipt of satisfactory documentation of same.

7.      Truman's participation in all PRTM benefit plans and programs shall terminate on the Separation Date except (a) as set forth in Section C.2. of this Agreement above, (b) as required by federal or applicable state law, or (c) as permitted by the conversion, vesting, or other provisions of the applicable benefit plans and programs.

## D.    **POST-SEPARATION OBLIGATIONS**

1.      Truman acknowledges and agrees that, pursuant to Section 7.01 of the Employment Agreement, she will no longer hold any officer, director, or other positions of any kind with PRTM and any subsidiary companies or other entities that, directly or indirectly through one or more subsidiary corporations or other entities, are controlled by or under common control with PRTM (the "PRTM Entities").

2.      Truman will comply fully with Section 7.02 of the Employment Agreement, and provide PRTM upon request with a certification confirming such compliance as of the Separation Date.

3.      Truman acknowledges and agrees that her obligations under Section 7.03 of the Employment Agreement will remain in full force and effect following the Separation Date.

4.      From the effective date of this Agreement and continuing after the Separation Date, Truman will not make any disparaging, false, misleading, or derogatory statements, written or unwritten, about the PRTM Entities or any of their directors, officers, and employees, to any third party. PRTM agrees that none of its directors and officers will make any disparaging, false, misleading, or derogatory statement, written or

oral, about Truman to any third party, and further agrees that if it discloses the specific terms of this Agreement to any other directors, stockholders, officers, or employees of any of the PRTM Entities (which it shall do only on a need-to-know basis), any such person will be instructed not make any disparaging, false, misleading, or derogatory statements, oral or written, about Truman to any third party.  PRTM agrees that employees reporting to Truman on the ▆▆▆▆▆ project do not have a need-to-know any of the terms of this Agreement.

5.    Nothing in Section D.4 above or any other provision of this Agreement shall prohibit or bar either Party from providing truthful testimony in any legal proceeding, from communicating with any governmental agency or representative, or from making any truthful disclosure required under law; *provided, however,* that advance written notice is provided to the other Party of any Party's intent to make such disclosures and provided that best efforts will be used to ensure that the terms of Section C.4 of this Agreement are complied with to the maximum possible extent.

6.    Truman will direct any requests for verbal references to Cuneyt Oge, who shall respond to such requests in a positive manner.

7.    Truman represents and agrees that she has complied and will continue to comply fully with the PRTM Confidentiality, Non-Competition, Non-Solicitation and Assignment Agreement that she executed on or about November 16, 2007 (the "Confidentiality Agreement"), and that the Confidentiality Agreement shall survive execution of this Agreement and continue in full force and effect according to its terms, except as expressly set forth below:

a.    PRTM agrees that the definition of "Intellectual Property" set forth in Article II of the Confidentiality Agreement shall not include Truman's Business Decomposition Model (or her other models or intellectual property) in the form they existed prior to commencement of her employment with PRTM;

b.    PRTM agrees that the Non-Solicitation provision set forth in Section 3.1.2 of the Confidentiality Agreement shall not apply to the individuals specifically identified in Exhibit A; and

c.    PRTM agrees that the Non-Competition provisions of Article IV of the Confidentiality Agreement shall only apply to individuals or entities that fall within the scope of the Non-Solicitation provisions of Article III, as modified by Section 7.b of this Agreement above.

8.    The Parties agree to keep all terms of this Agreement completely confidential, and not to disclose any such matters to anyone, in words or in substance, except as set forth in this Section D.8.  Truman may disclose such matters (a) to her immediately family members, attorneys and/or accountants, *provided that* she shall first obtain any such person's agreement to keep any such matters completely confidential and not to disclose any such matters to anyone; and (b) to the extent required by law or to the extent necessary to enforce her rights under this Agreement.  PRTM may disclose such

matters (a) to the PRTM Entities' directors, stockholders, officers, employees, attorneys, accountants and other agents to the extent required in the regular course of business and/or on a "need-to-know" basis, *provided that* PRTM agrees that employees assigned to the ▆▆▆▆ project do not have a need-to-know the terms of this Agreement *and provided that* PRTM shall first obtain any such person's agreement to keep any such matters completely confidential and not to disclose any such matters to anyone; and (b) to the extent required by law or to the extent necessary to enforce its rights under this Agreement.

### E.    **RELEASES**

1.    In consideration of the good and valuable consideration set forth in this Agreement, the receipt and sufficiency of which is hereby acknowledged, and as an express condition to the Parties' respective rights and obligations hereunder, (a) Truman and PRTM will execute the releases attached hereto at Exhibits B-1 and C-1, respectively, simultaneously with their execution of this Agreement; and (b) Truman and PRTM will execute the releases attached hereto as Exhibits B-2 and C-2, respectively, at the conclusion of the business day on October 31, 2008.

2.    Each Party expressly warrants and affirms that she or it has carefully read and understands the provisions of this Agreement and its Exhibits, including the releases that each is signing and will sign as an integral and indispensable part of this Agreement; that each has been represented by an attorney of his or its choice in connection with this Agreement and all of its Exhibits, including but not limited to the releases attached hereto as Exhibits B and C; that each has been given sufficient time and opportunity to consider the provisions of this Agreement and all of its Exhibits, and to decide to whether they wish to agree to their terms; and that neither has relied on any representation or statement by the other with respect to the subject matter or effect of this Agreement and all of its Exhibits, including but not limited to the releases attached hereto as Exhibits B and C, except as expressly set forth in this Agreement and its Exhibits.

### F.    **OTHER TERMS**

1.    This Agreement shall not in any way be construed as an express or implied admission by either Party of any act of wrongdoing against the other Party or any other person or entity, or as an express or implied admission by either Party of a violation of any law, statute or regulation. Each Party specifically disclaims any wrongful conduct toward the other.

2.    The laws of the Delawareother than those laws denominated choice of law rules that would cause the application of the laws of any other jurisdiction, shall govern the validity, construction and effect of this Agreement.

3.    In the event of a breach of this Agreement, the non-breaching Party shall be entitled to seek any and all relief available to it in law and/or equity, including but not limited to specific performance and injunctive relief. Additionally, in the event litigation is brought with respect to a claim of a breach of this Agreement, the prevailing Party

shall be entitled to recover from the losing Party her or its reasonable attorney's fees and expenses incurred in connection with such litigation.

4.    This Agreement contains the entire agreement between the Parties with respect to matters covered hereby, and supersedes all prior and contemporaneous communications, e-mails, agreements, representations, understanding or negotiations between Truman, PRTM and/or their agents or attorneys relating to such matters.

5.    This Agreement may not be amended or modified except by a writing signed by Truman and by a duly authorized representative of PRTM.  The waiver by either Party of a breach or violation of any provision of this Agreement shall not operate as, or construed to be, a waiver of any subsequent breach or violation thereof or any other provision of this Agreement.

6.    This Agreement shall inure to the benefit of and be binding upon PRTM and its successors and assigns, and shall inure to the benefit of and be binding upon Truman and her executors, administrators, heirs, and legal representatives.  Because Truman's duties and services hereunder are special, personal, and unique in nature, Truman may not transfer, sell, or otherwise assign any rights, obligations, or benefits under this Agreement.

7.    If any provision of this Agreement is held to be invalid, void, or unenforceable, the remaining provisions shall nevertheless continue in full force and effect without being impaired or invalidated in any way.  If any provision shall be deemed invalid due to its scope or breadth, such provision will be deemed valid to the full extent scope or breadth permitted by law.

8.    This Agreement may not be used as evidence in any subsequent proceeding of any kind, except one in which either Party alleges a breach of the terms of this Agreement, seeks to enforce it, or elects to use this Agreement as a defense to any claim.

9.    The Parties agrees to execute, acknowledge (if necessary), and deliver such documents, certificates or other instruments and take such other actions as may be reasonably required from time to time to carry out the intent and purposes of this Agreement.

10.    The language of all parts of this Agreement shall in all cases be construed as a whole, according to its fair meaning, and not strictly for or against either of the Parties.  The captions of the Sections of this Agreement are for convenience of reference only, and in no way define, limit or affect the scope or substance of any Section of this Agreement.

11.    This Agreement may be executed in any number of counterparts by the Parties.  All counterparts so executed shall constitute a single agreement binding upon the Parties.  Any and all copies of signatures transmitted in a PDF file over the internet or by facsimile shall be deemed to be original signatures for all purposes.

IN WITNESS WHEREOF, the Parties herein have executed this Agreement effective August 19, 2008.

PRTM MANAGEMENT CONSULTANTS, INC.        ROSEMARIE TRUMAN

By:_____

Title:_____

Date:_____

_____

Date: August 20, 2008_____

MARC WACO, as to clause B(3-5) Only

_____

Date: _____

**Exhibit B-1**

**RELEASE OF CLAIMS**

This Release of Claims (this "Release") is executed by Rosemarie Truman ("Truman") on August 12, 2008 (the "Effective Date") as a material term of, and in accordance with, the Confidential Separation and Release Agreement by and between Truman and PRTM Management Consultants, Inc. ("PRTM") dated August 12, 2008 (the "Agreement"). By executing this Release, Truman hereby agrees as follows:

1.     **Release of Claims.** For and in consideration of the good and valuable consideration set forth in the Agreement, which is hereby incorporated by reference, the sufficiency of which is hereby acknowledged, Truman, on behalf of herself and her spouse, heirs, children (if any), successors, current and former agents, representatives, executors, beneficiaries, administrators, trustees, attorneys and assigns, voluntarily releases and discharges PRTM and all other subsidiary corporations and other entities that, directly or indirectly through one or more subsidiary corporations or other entities, are controlled by or under common control with PRTM (together, the "PRTM Entities"), their predecessors, successors, subsidiaries, affiliates, and related entities; each of their current and former assigns, agents, officers, partners, members, directors, shareholders, employees, representatives, and attorneys; and all persons or entities acting by, through, under, or in concert with any of them (any and all of which are referred to as "Releasees"), from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, causes of action, damages, losses, expenses, and debts of any nature whatsoever, known or unknown ("Claims"), which Truman has, claims to have, ever had, or ever claimed to have had against Releasees through the Effective Date. This general release of Claims includes, without implication of limitation, all Claims relating to Truman's employment and separation from employment with PRTM; all Claims relating to Truman's relationship to, interest, equity or investment in, or memberships or officerships in PRTM; all Claims of discrimination, harassment and retaliation prohibited by any federal, state, or local statute, regulation, or ordinance, including without implication of limitation, Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Americans With Disabilities Act, the Family and Medical Leave Act, the Employee Retirement Income Securities Act; any and all similar applicable state laws; and all other statutory or common law Claims. Truman also waives any Claim for reinstatement, attorneys' fees, interest, or costs, and all Claims for wages or other compensation, *provided that* this Release shall not be construed to (a) impair Truman's right to enforce the terms of the Agreement and this Release, (b) release or discharge any rights Truman may have to indemnification or to protection under any insurance policy maintained by PRTM; (c) impair any rights Truman may have to vested 401(k) benefits; or (d) release or discharge any claims Truman may have for worker's compensation benefits. Truman hereby acknowledges and confirms that she did not report or, to the best of her knowledge and belief, experience, any work-related injury, or request any period of leave under the Family and Medical Leave Act, through the Effective Date.

**2.    Exception for Anti-Discrimination Agency Proceedings.** Nothing in this Release shall be interpreted to prohibit Truman from filing a discrimination claim with any anti-discrimination agency, or from participating in a discrimination investigation or proceeding conducted by any such agency. However, by signing this Release, Truman acknowledges that she is waiving any and all rights to money damages and any other relief that might otherwise be available (including without limitation reinstatement, equitable relief, and attorneys' fees) should she or any other person or entity pursue any claims subject to this Release.

**3.    California Civil Code Section 1542.** Truman is hereby advised of California Civil Code Section 1542, which provides as follows:

> "A general release does not extend to claims which the creditor does not know or suspect to exist in his/her favor at the time of executing the release, which if known by him/her must have materially affected his/her settlement with the debtor."

To the extent, if any, which California Civil Code Section 1542 might be applicable, Truman knowingly and intentionally waives and relinquishes all rights thereunder. In connection with such waiver and relinquishment, Truman acknowledges that she is aware that she may hereafter discover Claims presently unknown or unsuspected, or facts in addition to or different from those which she now knows or believes to be true, with respect to the matters released herein. Nevertheless, it is Truman's intention to fully, finally and forever release all such matters, and all potential Claims relative thereto, which do now exist, may exist or heretofore have existed against the Releasees.

**4.    Non-Filing of Complaint or Charges.** By signing this Release, Truman represents that she has not filed any complaint or charge against PRTM or against any of the Releasees with any local, state or federal agency or court, or assigned any of the released Claims to any third party.

**5.    Voluntary Waiver and Acknowledgement.** Truman acknowledges that she has carefully read and understands the terms of this Release, that she has consulted with the attorney of her choice in connection with its execution, and that she has not relied on any representation or statement made by PRTM or any other person with regard to the subject matter or effect of this Release that is not contained in the Agreement or this Release.

**6.    Time for Consideration.** Truman acknowledges that she has been given sufficient time and opportunity to consider this Release before executing it.

**7.    Other Terms.** This Release shall be governed and construed in accordance with Delaware law. If any provision of this Release is deemed invalid, the remaining provisions shall not be affected and shall be enforced to the maximum extent permitted by law.

IN WITNESS WHEREOF, Truman has executed this Release as of August 21, 2008.


_____
ROSEMARIE TRUMAN

Date:  August 21, 2008

**Exhibit B-2**

**RELEASE OF CLAIMS**

This Release of Claims (this "Release") is executed by Rosemarie Truman ("Truman") on October 31, 2008 (the "Effective Date") as a material term of, and in accordance with, the Confidential Separation and Release Agreement by and between Truman and PRTM Management Consultants, Inc. ("PRTM") dated August 12, 2008 (the "Agreement"). By executing this Release, Truman hereby agrees as follows:

1.     **Release of Claims.** For and in consideration of the good and valuable consideration set forth in the Agreement, which is hereby incorporated by reference, the sufficiency of which is hereby acknowledged, Truman, on behalf of herself and her spouse, heirs, children (if any), successors, current and former agents, representatives, executors, beneficiaries, administrators, trustees, attorneys and assigns, voluntarily releases and discharges PRTM and all other subsidiary corporations and other entities that, directly or indirectly through one or more subsidiary corporations or other entities, are controlled by or under common control with PRTM (together, the "PRTM Entities"), their predecessors, successors, subsidiaries, affiliates, and related entities; each of their current and former assigns, agents, officers, partners, members, directors, shareholders, employees, representatives, and attorneys; and all persons or entities acting by, through, under, or in concert with any of them (any and all of which are referred to as "Releasees"), from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, causes of action, damages, losses, expenses, and debts of any nature whatsoever, known or unknown ("Claims"), which Truman has, claims to have, ever had, or ever claimed to have had against Releasees through the Effective Date. This general release of Claims includes, without implication of limitation, all Claims relating to Truman's employment and separation from employment with PRTM; all Claims relating to Truman's relationship to, interest, equity or investment in, or memberships or officerships in PRTM; all Claims of discrimination, harassment and retaliation prohibited by any federal, state, or local statute, regulation, or ordinance, including without implication of limitation, Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Americans With Disabilities Act, the Family and Medical Leave Act, the Employee Retirement Income Securities Act; any and all similar applicable state laws; and all other statutory or common law Claims. Truman also waives any Claim for reinstatement, attorneys' fees, interest, or costs, and all Claims for wages or other compensation, *provided that* this Release shall not be construed to (a) impair Truman's right to enforce the terms of the Agreement and this Release, (b) release or discharge any rights Truman may have to indemnification or to protection under any insurance policy maintained by PRTM; (c) impair any rights Truman may have to vested 401(k) benefits; or (d) release or discharge any claims Truman may have for worker's compensation benefits. Truman hereby acknowledges and confirms that she did not report or, to the best of her knowledge and belief, experience, any work-related injury, or request any period of leave under the Family and Medical Leave Act, through the Effective Date.

**2.    Exception for Anti-Discrimination Agency Proceedings.** Nothing in this Release shall be interpreted to prohibit Truman from filing a discrimination claim with any anti-discrimination agency, or from participating in a discrimination investigation or proceeding conducted by any such agency. However, by signing this Release, Truman acknowledges that she is waiving any and all rights to money damages and any other relief that might otherwise be available (including without limitation reinstatement, equitable relief, and attorneys' fees) should she or any other person or entity pursue any claims subject to this Release.

**3.    California Civil Code Section 1542.** Truman is hereby advised of California Civil Code Section 1542, which provides as follows:

> "A general release does not extend to claims which the creditor does not know or suspect to exist in his/her favor at the time of executing the release, which if known by him/her must have materially affected his/her settlement with the debtor."

To the extent, if any, which California Civil Code Section 1542 might be applicable, Truman knowingly and intentionally waives and relinquishes all rights thereunder. In connection with such waiver and relinquishment, Truman acknowledges that she is aware that she may hereafter discover Claims presently unknown or unsuspected, or facts in addition to or different from those which she now knows or believes to be true, with respect to the matters released herein. Nevertheless, it is Truman's intention to fully, finally and forever release all such matters, and all potential Claims relative thereto, which do now exist, may exist or heretofore have existed against the Releasees.

**4.    Non-Filing of Complaint or Charges.** By signing this Release, Truman represents that she has not filed any complaint or charge against PRTM or against any of the Releasees with any local, state or federal agency or court, or assigned any of the released Claims to any third party.

**5.    Voluntary Waiver and Acknowledgement.** Truman acknowledges that she has carefully read and understands the terms of this Release, that she has consulted with the attorney of her choice in connection with its execution, and that she has not relied on any representation or statement made by PRTM or any other person with regard to the subject matter or effect of this Release that is not contained in the Agreement or this Release.

**6.    Time for Consideration.** Truman acknowledges that she has been given sufficient time and opportunity to consider this Release before executing it.

**7.    Other Terms.** This Release shall be governed and construed in accordance with Delaware law. If any provision of this Release is deemed invalid, the remaining provisions shall not be affected and shall be enforced to the maximum extent permitted by law.

IN WITNESS WHEREOF, Truman has executed this Release as of October 31, 2008.


_____

ROSEMARIE TRUMAN

Date:  October 31, 2008

**Exhibit C-1**

**RELEASE OF CLAIMS**

This Release of Claims (this "Release") is executed by PRTM Management Associates, Inc. ("PRTM") on August 12, 2008 (the "Effective Date") as a material term of, and in accordance with, the Confidential Separation and Release Agreement by and between PRTM and Rosemarie Truman ("Truman") dated August 12, 2008 (the "Agreement"). By executing this Release, PRTM hereby agrees as follows:

1.    **Release of Claims.**  In consideration of the good and valuable consideration set forth in the Agreement, which is hereby incorporated by reference, the sufficiency of which is hereby acknowledged, PRTM, on behalf of itself and all other subsidiary corporations or other entities that, directly or indirectly through one or more subsidiary corporations or other entities, are controlled by or under common control with PRTM (together, the "PRTM Entities"), their predecessors, successors, subsidiaries, affiliates, and related entities; each of their current and former assigns, agents, officers, partners, members, directors, shareholders, employees, representatives, and attorneys; and all persons or entities acting by, through, under, or in concert with any of them, voluntarily releases and discharges Truman and her spouse, heirs, children (if any), successors, current and former agents, representatives, executives, beneficiaries, administrators, trustees, attorneys and assigns (any and all of which are referred to as "Releasees"), from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, causes of action, damages, losses, expenses, and debts of any nature whatsoever, known or unknown ("Claims"), which the PRTM Entities have, claim to have, ever had, or ever claimed to have had against Releasees through the Effective Date.  This general release of Claims includes, without implication of limitation, all Claims relating to Truman's employment and separation from employment with PRTM; all Claims relating to Truman's relationship to, interest, equity or investment in, or memberships or officerships in PRTM; and all other statutory or common law Claims.  PRTM also waives all Claims for attorneys fees, interest, or costs, *provided that* this Release shall not be construed to impair PRTM's right to enforce the terms of the Agreement and this Release.

2.    **California Civil Code Section 1542.**  PRTM is aware of California Civil Code Section 1542, which provides as follows:

> "A general release does not extend to claims which the creditor does not know or suspect to exist in his/her favor at the time of executing the release, which if known by him/her must have materially affected his/her settlement with the debtor."

To the extent, if any, which California Civil Code Section 1542 might be applicable, PRTM knowingly and intentionally waives and relinquishes all rights thereunder.  In connection with such waiver and relinquishment, PRTM acknowledges that PRTM is

aware that it may hereafter discover Claims presently unknown or unsuspected, or facts in addition to or different from those which PRTM now knows or believes to be true, with respect to the matters released herein. Nevertheless, it is PRTM's intention to fully, finally and forever release all such matters, and all potential Claims relative thereto, which do now exist, may exist or heretofore have existed against the Releasees.

**3.**     **Non-Filing of Complaint or Charges**. By signing this Release, PRTM represents that PRTM Entities have not filed any complaint or charge against Truman or against any of the Releasees with any local, state or federal agency or court, or assigned any of the released Claims to any third party.

**4.**     **Voluntary Waiver and Acknowledgement.** PRTM acknowledges that it has carefully read and understands the terms of this Release, that it has consulted with the attorney of its choice in connection with its execution, and that it has not relied on any representation or statement made by Truman or any other person with regard to the subject matter or effect of this Release that is not contained in the Agreement or this Release.

**5.**     **Time for Consideration.** PRTM acknowledges that it has been given sufficient time and opportunity to consider this Release.

**6.**     **Other Terms.** This Release shall be governed and construed in accordance with Delaware law. If any provision of this Release is deemed invalid, the remaining provisions shall not be affected and shall be enforced to the maximum extent permitted by law.

IN WITNESS WHEREOF, PRTM, through its duly authorized representative, has executed this Release as of August 12, 2008.

PRTM MANAGEMENT CONSULTANTS, INC.

By:_____

Title: _____

Date: August 19, 2008

**Exhibit C-2**

**RELEASE OF CLAIMS**

This Release of Claims (this "Release") is executed by PRTM Management Associates, Inc. ("PRTM") on October 31, 2008 (the "Effective Date") as a material term of, and in accordance with, the Confidential Separation and Release Agreement by and between PRTM and Rosemarie Truman ("Truman") dated August 12, 2008 (the "Agreement'). By executing this Release, PRTM hereby agrees as follows:

1.      **Release of Claims.**  In consideration of the good and valuable consideration set forth in the Agreement, which is hereby incorporated by reference, the sufficiency of which is hereby acknowledged, PRTM, on behalf of itself and all other subsidiary corporations or other entities that, directly or indirectly through one or more subsidiary corporations or other entities, are controlled by or under common control with PRTM (together, the "PRTM Entities"), their predecessors, successors, subsidiaries, affiliates, and related entities; each of their current and former assigns, agents, officers, partners, members, directors, shareholders, employees, representatives, and attorneys; and all persons or entities acting by, through, under, or in concert with any of them, voluntarily releases and discharges Truman and her spouse, heirs, children (if any), successors, current and former agents, representatives, executives, beneficiaries, administrators, trustees, attorneys and assigns (any and all of which are referred to as "Releasees"), from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, causes of action, damages, losses, expenses, and debts of any nature whatsoever, known or unknown ("Claims"), which the PRTM Entities have, claim to have, ever had, or ever claimed to have had against Releasees through the Effective Date.  This general release of Claims includes, without implication of limitation, all Claims relating to Truman's employment and separation from employment with PRTM; all Claims relating to Truman's relationship to, interest, equity or investment in, or memberships or officerships in PRTM; and all other statutory or common law Claims.  PRTM also waives all Claims for attorneys fees, interest, or costs, *provided that* this Release shall not be construed to impair PRTM's right to enforce the terms of the Agreement and this Release.

2.      **California Civil Code Section 1542.**  PRTM is aware of California Civil Code Section 1542, which provides as follows:

> "A general release does not extend to claims which the creditor does not know or suspect to exist in his/her favor at the time of executing the release, which if known by him/her must have materially affected his/her settlement with the debtor."

To the extent, if any, which California Civil Code Section 1542 might be applicable, PRTM knowingly and intentionally waives and relinquishes all rights thereunder.  In connection with such waiver and relinquishment, PRTM acknowledges that PRTM is aware that it may hereafter discover Claims presently unknown or unsuspected, or facts in addition to or different from those which PRTM now knows or believes to be true, with respect to the matters released herein.  Nevertheless, it is PRTM's intention to fully, finally and forever release all such matters, and all

16

potential Claims relative thereto, which do now exist, may exist or heretofore have existed against the Releasees.

**3.     Non-Filing of Complaint or Charges**.  By signing this Release, PRTM represents that PRTM Entities have not filed any complaint or charge against Truman or against any of the Releasees with any local, state or federal agency or court, or assigned any of the released Claims to any third party.

**4.     Voluntary Waiver and Acknowledgement.**  PRTM acknowledges that it has carefully read and understands the terms of this Release, that it has consulted with the attorney of its choice in connection with its execution, and that it has not relied on any representation or statement made by Truman or any other person with regard to the subject matter or effect of this Release that is not contained in the Agreement or this Release.

**5.     Time for Consideration.**  PRTM acknowledges that it has been given sufficient time and opportunity to consider this Release.

**6.     Other Terms.**  This Release shall be governed and construed in accordance with Delaware law.  If any provision of this Release is deemed invalid, the remaining provisions shall not be affected and shall be enforced to the maximum extent permitted by law.

        IN WITNESS WHEREOF, PRTM, through its duly authorized representative, has executed this Release as of October 31, 2008.

PRTM MANAGEMENT CONSULTANTS, INC.

By:_____

Title: _____

Date:  October 31, 2008

4363742v2

17

# Exhibit B

<u>Truman v. PRTM Management Consultants, Inc., *et al.*</u>

## David Wachtel

| | |
|---|---|
| **From:** | Reif, Alison [areif@choate.com] |
| **Sent:** | Wednesday, August 20, 2008 4:55 PM |
| **To:** | David Wachtel |
| **Subject:** | Urgent - final version |
| **Importance:** | High |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Green |

of our agreement is attached (clean and redlined against the last version you sent over, earlier today).  In addition, PRTM has agreed to all of Exhibit B as you emailed it to me this afternoon (now Exhibit A), except that the ████████ tab needs to be removed.

Please let me know if the attached is acceptable before 5:30.  If so, please send along Rosemarie's signature later this evening.  If not, PRTM will assume the deal is off.  Unfortunately, having extended the deadline so many times at Ms. Truman's request, PRTM needs to get signatures today or proceed otherwise.

Sincerely,

Alison F. Reif



Choate, Hall & Stewart LLP
Two International Place
Boston, MA 02110
t  617-248-5157
f  617-248-4000·
m 781-962-0654
areif@choate.com
www.choate.com

Assistant:  Denise M. Genzler (617) 248-4758

Confidentiality Statement:

This Message is transmitted to you by the law firm of Choate, Hall & Stewart LLP.  The substance of this message, along with any attachments, may be confidential and legally privileged.  If you are not the designated recipient of this message, please destroy it and notify the sender of the error by return e-mail or by calling 1-800-520-2427.

Under regulations of the Treasury Department, we are required to include the following statement in this message: Any advice contained herein (or in any attachment hereto) regarding federal tax matters was not intended or written by the sender to be used, and it cannot be used by any taxpayer, for the purpose of avoiding penalties that may be imposed on the taxpayer.

For more information about Choate, Hall & Stewart LLP, please visit us at choate.com

# Exhibit C

<u>Truman v. PRTM Management Consultants, Inc., *et al.*</u>

## David Wachtel

| | |
|---|---|
| **From:** | Reif, Alison [areif@choate.com] |
| **Sent:** | Wednesday, August 20, 2008 6:31 PM |
| **To:** | David Wachtel |
| **Subject:** | RE: Truman Agreement |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Green |

Thank you.  We will delete "and see Tab" from Exhibit A, which I assume was just an oversight.  If Ms. Truman can sign B-1 and forward before 9 am tomorrow, that will be fine.  I will do the same with signatures on PRTM's part.

**From:** David Wachtel [mailto:wachtel@bernabeipllc.com]
**Sent:** Wednesday, August 20, 2008 6:27 PM
**To:** Reif, Alison
**Subject:** Truman Agreement

The signed agreement is attached.  Please provide your clients' signatures as soon as possible.  Ms. Truman apparently did not realize that she had to sign not only the agreement but attachment B-1.  She has back-to-back evening meetings at ▮▮▮▮▮ tonight starting at 6:00 pm, but I expect that she will sign attachment B-1 as soon as she is able.

David Wachtel
Bernabei & Wachtel
1775 T Street, N.W.
Washington, D.C. 20009
(202) 745-1942 (ext. 235)

The information contained in this e-mail message is intended for the personal and confidential use of the designated recipient(s) named in the address box. This message may be attorney-client communication, and as such, is privileged and confidential. Do NOT forward this message to any third party. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error, and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this message in error, please notify us immediately by telephone; delete this message from all your files, and return any printouts you may have made to us by regular mail.

**From:** David Wachtel
**Sent:** Wednesday, August 20, 2008 6:16 PM
**To:** 'rosemarietruman@gmail.com'
**Cc:** 'Mount, Clifton M.'
**Subject:** Signed

You need to sign page 11 also.

David Wachtel
Bernabei & Wachtel
1775 T Street, N.W.
Washington, D.C. 20009

(202) 745-1942 (ext. 235)

The information contained in this e-mail message is intended for the personal and confidential use of the designated recipient(s) named in the address box. This message may be attorney-client communication, and as such, is privileged and confidential. Do NOT forward this message to any third party. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error, and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this message in error, please notify us immediately by telephone; delete this message from all your files, and return any printouts you may have made to us by regular mail.

**From:** Rosemarie Truman [mailto:rosemarietruman@gmail.com]
**Sent:** Wednesday, August 20, 2008 6:00 PM
**To:** David Wachtel
**Cc:** Mount, Clifton M.
**Subject:** signed

maybe email it at the last minute - 10 minutes to midnight !!!

also - suggest calling her up to state that there will be a bar complaint against them

Confidentiality Statement:

This Message is transmitted to you by the law firm of Choate, Hall & Stewart LLP. The substance of this message, along with any attachments, may be confidential and legally privileged. If you are not the designated recipient of this message, please destroy it and notify the sender of the error by return e-mail or by calling 1-800-520-2427.

Under regulations of the Treasury Department, we are required to include the following statement in this message: Any advice contained herein (or in any attachment hereto) regarding federal tax matters was not intended or written by the sender to be used, and it cannot be used by any taxpayer, for the purpose of avoiding penalties that may be imposed on the taxpayer.

For more information about Choate, Hall & Stewart LLP, please visit us at choate.com

# Exhibit D

<u>Truman v. PRTM Management Consultants, Inc.,</u> <u>*et al.*</u>

## David Wachtel

| | |
|---|---|
| **From:** | Reif, Alison [areif@choate.com] |
| **Sent:** | Thursday, August 21, 2008 11:25 AM |
| **To:** | David Wachtel |
| **Subject:** | Final agreement |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Orange |

Dave,

In signing the releases, PRTM noticed that we did not change the agreement and effective dates in the first four lines of each release, and that the signature dates on B-1 and C-1 varied.  I have fixed those two areas (only) in the attached version, so please have Rosemarie sign the attached B-1 in lieu of yesterday's, and PRTM will do the same for C-1.  This will not change the agreement itself, so no need to re-do that.  Please let me know if there are any questions/issues.

Many thanks,
Alison

Alison F. Reif



Choate, Hall & Stewart LLP
Two International Place
Boston, MA 02110
t   617-248-5157
f   617-248-4000
m 781-962-0654
areif@choate.com
www.choate.com

Assistant:  Denise M. Genzler (617) 248-4758

Confidentiality Statement:

This Message is transmitted to you by the law firm of Choate, Hall & Stewart LLP.  The substance of this message, along with any attachments, may be confidential and legally privileged.  If you are not the designated recipient of this message, please destroy it and notify the sender of the error by return e-mail or by calling 1-800-520-2427.

Under regulations of the Treasury Department, we are required to include the following statement in this message: Any advice contained herein (or in any attachment hereto) regarding federal tax matters was not intended or written by the sender to be used, and it cannot be used by any taxpayer, for the purpose of avoiding penalties that may be imposed on the taxpayer.

For more information about Choate, Hall & Stewart LLP, please visit us at choate.com

Truman v. PRTM Complaint
Exhibit D

**Exhibit E**

Truman v. PRTM Management Consultants, Inc., *et al.*

# David Wachtel

| | |
|---|---|
| **From:** | Reif, Alison [areif@choate.com] |
| **Sent:** | Thursday, August 21, 2008 4:17 PM |
| **To:** | David Wachtel |
| **Subject:** | RE: Truman v. PRTM |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Orange |

The revision was simply correcting a couple of typos, but very well. If you prefer my clients to sign the old version, I will get them to redo their signatures. It will just take a bit more time to get them to you.

---

**From:** David Wachtel [mailto:wachtel@bernabeipllc.com]
**Sent:** Thursday, August 21, 2008 4:06 PM
**To:** Reif, Alison
**Subject:** Truman v. PRTM

Alison:

You write at 11:25 a.m.:

> *Dave,*
>
> *In signing the releases, PRTM noticed that we did not change the agreement and effective dates in the first four lines of each release, and that the signature dates on B-1 and C-1 varied. I have fixed those two areas (only) in the attached version, so please have Rosemarie sign the attached B-1 in lieu of yesterday's, and PRTM will do the same for C-1. This will not change the agreement itself, so no need to re-do that. Please let me know if there are any questions/issues.*
>
> *Many thanks,*
> *Alison*
>
> *Alison F. Reif*

My view is that we have a deal and -- to paraphrase your language yesterday -- 'it is too late to change anything.' I've attached the key transmittal e-mails and their attachments. Ms. Truman signed what you asked her to sign, on a timetable that you dictated and only modified unilaterally. She signed exactly the release that you asked for, modifying only to show the actual date of her signature.

My reaction might have been different if PRTM had not struck the letter of reference provision late in the day yesterday and had made good on its earlier offer to incorporate additional ▓▓▓▓▓ names into the solicitation provision.

I will discuss your request with my client, but I do not see that she needs to sign a modified release since we so clearly have a valid, enforceable agreement.

David Wachtel
Bernabei & Wachtel
1775 T Street, N.W.
Washington, D.C. 20009
(202) 745-1942 (ext. 235)

The information contained in this e-mail message is intended for the personal and confidential use of the designated recipient(s) named in the address box. This message may be attorney-client communication, and as such, is privileged and confidential. Do NOT forward this message to any third party. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error, and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this message in error, please notify us immediately by telephone; delete this message from all your files, and return any printouts you may have made to us by regular mail.

Confidentiality Statement:

This Message is transmitted to you by the law firm of Choate, Hall & Stewart LLP. The substance of this message, along with any attachments, may be confidential and legally privileged. If you are not the designated recipient of this message, please destroy it and notify the sender of the error by return e-mail or by calling 1-800-520-2427.

Under regulations of the Treasury Department, we are required to include the following statement in this message: Any advice contained herein (or in any attachment hereto) regarding federal tax matters was not intended or written by the sender to be used, and it cannot be used by any taxpayer, for the purpose of avoiding penalties that may be imposed on the taxpayer.

For more information about Choate, Hall & Stewart LLP, please visit us at choate.com

JS-44
Rev.1/05 DC)

# CIVIL COVER SHEET

H
08 1515
Rmc

## I (a) PLAINTIFFS

ROSEMARIE TRUMAN

88888

## DEFENDANTS

PRTM MANAGEMENT CONSULTANTS, INC.;
PRTM MANAGEMENT CONSULTANTS, LLC.

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF ___88888___
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

LYNNE BERNABEI
DAVID WACHTEL
ALAN KABAT
BERNABEI & WACHTEL, PLLC
1775 T STREET, NW
WASHINGTON, DC 20009
202-745-1942

ATTORNEYS (IF KNOWN)

JURY ACTION

Case: 1:08-cv-01515
Assigned To : Collyer, Rosemary M.
Assign. Date : 8/29/2008
Description: Employ. Discrim.

## II. BASIS OF JURISDICTION

(PLACE an x IN ONE BOX ONLY)

○ 1 U.S. Government
Plaintiff

○ 3 Federal Question
(U.S. Government Not a Party)

○ 2 U.S. Government
Defendant

◉ 4 Diversity
(Indicate Citizenship of
Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ◉ 4 |
| Citizen of Another State | ◉ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

○ A. Antitrust

☐ 410 Antitrust

○ B. Personal Injury/
Malpractice

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ C. Administrative Agency
Review

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff))
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))
**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If
Administrative Agency is Involved)

○ D. Temporary Restraining
Order/Preliminary
Injunction

Any nature of suit from any category may
be selected for this category of case
assignment.

*(If Antitrust, then A governs)*

○ E. General Civil (Other)        OR        ○ F. Pro Se General Civil

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or
defendant
☐ 871 IRS-Third Party 26
USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure
of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational
Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC
Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced &
Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/
Exchange
☐ 875 Customer Challenge 12 USC
3410
☐ 900 Appeal of fee determination
under equal access to Justice
☐ 950 Constitutionality of State
Statutes
☐ 890 Other Statutory Actions (if
not administrative agency
review or Privacy Act

2

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☒ 442 Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding    ○ 2 Removed from State Court    ○ 3 Remanded from Appellate Court    ○ 4 Reinstated or Reopened    ○ 5 Transferred from another district (specify)    ○ 6 Multi district Litigation    ○ 7 Appeal to District Judge from Mag. Judge

---

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

D.C. Human Rights Act, D.C. Code 2-1401; Breach of Contract

---

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | **DEMAND $** 2,000,000 <br> **JURY DEMAND:** | Check YES only if demanded in compl<br>YES ☒   NO ☐ |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☐   NO ☐    If yes, please complete related case form.

**DATE** August 29, 2008    **SIGNATURE OF ATTORNEY OF RECORD** _____

---

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

